Lowndes *v.* Dickerson.

[ORANGE GENERAL TERM, September 9, 1861. *Emott, Brown* and *Scrugham,* Justices.]

---

## LOWNDES *vs.* DICKERSON.

Oysters, planted by an individual in a bed clearly marked out and defined, in the tide waters of a bay or arm of the sea, which is a common fishery to all the inhabitants of the state where the bay or arm of the sea is situated, and where there are no oysters growing spontaneously, at the time, are the property of the person who plants them; and the taking them by another person is a trespass, for which an action lies.

It is indispensable to the existence of the right of property in oysters thus planted that the bed shall not interfere with the exercise of the common right of fishing; for if the oysters were mingled with and undistinguishable from others, of natural growth, in the public waters, the interest of the person planting them would be subservient to the public use. *Per* BROWN, J.

Northport Harbor, being an indentation upon the southern shore of Long Island Sound, is a part of the high seas, with reference to the question of individual ownership of oyster beds planted therein.

Although diverse opinions have been given, in this country and in England, upon the subject, the weight of authority seems to be adverse to the existence of any power in the British crown to grant to an individual the right of taking fish in the sea and in the creeks and arms thereof, in exclusion of the common liberty. *Per* BROWN, J.

The right of fishing in the sea is a common right; that is, a right inherent in all the people of the realm, by the common law. It is one of those rights held by the sovereign power, in trust for all the people.

Nothing passes by grant, in derogation of such rights, by implication.

Grants of this description are construed strictly, and an intention to part with any part or portion of such rights will not be presumed, unless clear and special words are used to denote it.

The title to the lands under the waters of Northport Harbor, in Long Island Sound, is not in the town of Huntington; and the inhabitants thereof have not the exclusive right to take fish therein.

Lowndes *v.* Dickerson.

THIS action was heard on exceptions taken at the trial, by the defendant, which exceptions were ordered to be heard in the first instance at the general term. The nature of the action and the facts appearing, and the exceptions taken, on the trial, are stated in the opinion of the court.

*S. E. Lyon*, for the plaintiff.

*Henry Nicoll*, for the defendant.

*By the Court*, BROWN, J.   This is an action of trespass *de bonis asportatis*, tried before Mr. Justice EMOTT, at the Suffolk circuit, in June, 1860, where the plaintiff had a verdict. The wrong consisted in taking and carrying away a quantity of oysters from the bed or bottom of Long Island Sound, about 100 yards from the shore, within or adjacent to the town of Huntington, in the county of Suffolk, where the plaintiff had deposited or planted them. The taking of the oysters was not disputed upon the trial, but the point litigated was the right of property in the plaintiff, and his right to maintain this action.

Upon the trial the plaintiff gave evidence tending to show that he commenced planting oysters in the waters of Northport Harbor in the year 1845, and has continued to plant there every year since, in water five feet in depth in-shore at ordinary tides, and from five to six fathoms deep on the outer edge of the bed. Before commencing to plant, he examined the bottom with a dredge. The ground was 500 or 600 yards in length by 300 yards in width. He took up some scollops and stones, but found no oysters. Before beginning the examination, the boundaries of the ground were marked with stakes inside and buoys on the outside. The stakes remained until the ice in winter carried them away, and in the spring they were replaced. The buoys were visible at high tide and the stakes at low tide. The in-shore line is about 110 yards off shore. Within the two years before the trial the plain-

tiff had planted about 7000 bushels of oysters in the bed. Theodore Lowndes and James Sills lived in sight of the oyster bed and were employed to watch it. At the time the defendant took the oysters in dispute, he had notice that they had been put there by the plaintiff, who claimed them as his own. In the progress of the trial, and after the plaintiff had rested, the defendant offered to prove by the witness Israel Tilden that oysters of natural growth have been caught outside the stakes which mark the boundaries of the plaintiff's bed, and in the neighborhood, both before and since the stakes were put down, and that oysters of natural growth exist there at this time. This evidence was objected to by the counsel for the plaintiff and the objection sustained by the court, and the defendant thereupon excepted. It will be seen, upon looking further into the case, that the proposed evidence was rejected because the neighborhod was too remote from the *locus in quo.* No one disputed that oysters of natural growth exist in the waters of Long Island Sound, and the examinations of the ground made by the plaintiff, before proceeding to stake out the bed, imply that this fact was not in dispute upon the trial. The proof offered and rejected was therefore clearly irrelevant, and of no value upon the questions in issue before the jury. Testimony was offered by the defendant, and received without objection, to show that oysters of natural growth existed in the immediate neighborhood of the plaintiff's stakes, and were found within the lines of his stakes before he marked out his bed. The court charged the jury that if there was a bed of oysters growing naturally in the place where the plaintiff planted his oysters, in 1845, and he mingled his oysters with the natural produce of the waters, he did not thereby acquire an exclusive title to the mingled mass or its increase. And at the request of the defendant's counsel he also charged, that if oysters were found before the planting by the plaintiff around and immediately adjoining the bed of the plaintiff, the jury should take that circumstance into consideration in determining the question

whether oysters of natural growth existed on the place planted by the plaintiff, at the time. The offer of the defendant to which the plaintiff objected was properly rejected, because it was too general and not sufficiently definite to be of any value in determining the issue made by the pleadings.

The two cases of *Fleet* v. *Hegeman*, (14 *Wend.* 42,) and *Decker* v. *Fisher*, (4 *Barb.* 592,) are authorities to show that oysters planted by an individual in a bed clearly marked out and defined in the tide waters of a bay or arm of the sea, which is a common fishery to all the inhabitants of the state where the bay or arm of the sea is situated, and where there are no oysters growing spontaneously at the time, are the property of the person who plants them, and the taking them by another person is a trespass, for which an action lies. It is indispensable to the existence of the right of property in oysters thus planted, that the bed shall not interfere with the exercise of the common right of fishing; for if the oysters were mingled with and undistinguishable from others, of natural growth, in the public waters, the interest of the person planting them would be subservient to the public use. The reasoning by which the court reached this conclusion will be found in the opinion of Ch. J. Nelson, delivered in the first named of these cases. It rests upon well settled principles, and need not be alluded to further. Northport Harbor, where the oyster bed of the plaintiff was located, is an indentation upon the southern shore of Long Island Sound, which, upon all the definitions, is a part of the high seas. If the jury believed the plaintiff's witnesses—and that was exclusively their province—then all the conditions required by the authorities to which I have referred, to entitle the plaintiff primarily to recover, existed, and he was entitled to a verdict; unless the defendant established the existence of some right or title in himself and others, or in those under whom he claimed, to exclude the plaintiff from the enjoyment of the oyster bed, and from appropriating a portion of the waters and bottom of the sound to the uses claimed by him. This he sought to

do by alleging—which was not disputed—that the plaintiff was not, on the 3d day of March, 1859, the day of committing the alleged trespass, or at any time before that day, an inhabitant of the town of Huntington, in the county of Suffolk. And also alleging, which was the real point in controversy, an exclusive right of fishery in the *locus in quo*, common to all the people of the town of Huntington, of which town the defendant was a commoner, under a grant from the crown of Great Britain. The defendant produced and read in evidence letters patent, granted in the reign of William and Mary, and dated the 5th day of October, in the year 1694, executed by Benjamin Fletcher, captain general and governor &c. of the province of New York &c., to Joseph Baily, Thomas Wicks and five others, freeholders and inhabitants of the town of Huntington, which is thereby created a body politic and corporate, by the name of the Trustees of the Freeholders and Commonalty of the town of Huntington, and their successors. It recites another patent for certain lands, premises, franchises and appurtenances theretofore granted, in the reign of Charles the 2d, dated the 30th day of November, 1666, to Jonas Wood and others, in behalf of themselves and their associates, the Freeholders and Inhabitants of the town of Huntington, and their successors &c., which it ratifies and confirms. The premises mentioned and granted in both instruments are therein described as certain "tracts and necks of land lying upon our said island of Nassau, within our said county of Suffolk, bounded on the west by a river called and known by the name of Cold Spring, a line running south from the head of said Cold Spring to the South sea; and on the north by the sound that runs between our said island of Nassau and the main continent; and on the east by a line running from the west side of the pond called and known by the name of Fresh pond, to the west side of Whitmansdale or hollow, and from thence to a river on the south side of our said island of Nassau, on the east side of a neck called Sampawams; and from the said river

south to the said South sea: together with all and singular the houses, messuages, tenements, buildings, mills, mill dams, fencings, inclosures, gardens, orchards, fields, pastures, feedings, woods, underwoods, swamps, plains, rivers, rivulets, waters, lakes, ponds, brooks, streams, beaches, quarries, trees, harbors, highways, easements, fishing, fouling, hunting, hawking, mines, minerals, &c., whatsoever to the said tracts of land within the limits and bounds next above mentioned, belonging or in any wise appertaining." Habendum to the use, benefit and behoof of the said freeholders and inhabitants respectively, in free and common socage. When the evidence was concluded, the counsel for the defendant requested the court to charge the jury, 1st. That the title to the lands under water in Northport Harbor being in the town of Huntington, the plaintiff could not recover. 2d. The inhabitants of the town of Huntington being entitled to the exclusive use of those waters, and the plaintiff being a nonresident of the town, could not recover. The court declined so to charge, and the defendant excepted.

This right of taking fish in the sea, and in the creeks and arms thereof, is common to the people of England, as a public common of piscary, and they may not, without injury to their right, be restrained thereof. And one of the points made by the counsel for the plaintiff is whether, since magna charter, "either the king or any particular subject can gain a proprietary exclusive of the common liberty." Diverse opinions have been given by the courts in this country and in England upon the subject. The weight of authority would seem to be adverse to the existence of any power in the crown to grant any such franchise. Its existence, however, has been affirmed in this court in the case of *Rogers* v. *Jones*, (1 *Wend*. 237.) It is manifest, however, upon looking into the opinion of Mr. Justice Woodworth, in that case, that he did not distinguish between grants by the crown alone and grants by the crown in concurrence with the legislative power of the realm expressed through an act of parliament. There

can be no doubt of the validity of grants made by the com-
missioners of the land office, of lands under the tide waters
of the state, to which the learned justice refers, and the more
recent grants by legislative acts to particular individuals and
corporations, because these are grants made by the people in
their sovereign capacity, acting through the legislature. The
authorities upon the question are referred to in *Angell on
Tide Waters, at page* 142. It is not material for us to con-
sider that subject further, because this case may be safely
disposed of upon another ground.

The things primarily granted by the patent of the 5th of
October, 1694, are therein described as " all the afore recited
tracts and necks of land lying upon our island of Nassau,
bounded on the west," &c., and giving as the northern boun-
dary, " the sound that runs between our said island of Nas-
sau and the main continent." To what line or limit does
this northern boundary of the patent extend ? Does it reach
into the waters of the sound, and if so, how far, or does it
stop at the shore ? If Long Island Sound was a fresh water
river, not flowed by the tide, we should know that this bound-
ary would extend *ad filum medium aquæ.* But the sound
is not a river at all, but an arm of the sea, separating the
island of Nassau from the main continent, and therefore the
rule in regard to fresh water rivers above tide waters does
not apply. The rule I understand to be this : " A grant of
land to a subject. or citizen, bounded upon a fresh water
stream or river, where the tide neither ebbs nor flows, ex-
tends *ad filum medium aquæ ;* but a grant bounded upon a
navigable river, that is, a river flowed by the tide, extends to
the edge of the water only." (1 *Halstead's N. J. Rep.* 1.
*See also the reporter's note to Ex parte Jennings,* 6 *Cowen's
Rep. at page* 544.)

The defendant, under his 4th point, contends that the pat-
ent geographically includes Northport Harbor, because the
boundary not only goes to the sound on the north, but among
the things granted are havens, harbors, creeks, &c, The

word creek signifies a small inlet, bay, or cove, a recess in the shore of the sea, or a river; and the words harbor and haven signify a place of shelter and protection for ships and vessels, where they may lie in safety during storms and stress of weather. The argument of the defendant proceeds upon the theory that there are no harbors, havens or creeks inside of the south shore of the sound upon the rivers or inlets, if any, which intersects the island in the town of Huntington, to which the words quoted can apply. The proof is silent in respect thereto. But there is an express limitation upon the effect of these words, in the patent itself, which declares that the havens, harbors, creeks, &c., with the other rights and franchises, are to be "within the limits and bounds next above mentioned;" that is, they are such as may be within the limits of the territory bounded north by the shore of Long Island Sound. The right of fishing in the sea is denominated a common right; that is, a right inherent in all the people of the realm, by the common law. It is one of those rights held by the sovereign power in trust for all the people. Nothing passes by grant in derogation of such rights, by implication. Grants of this description are construed strictly, and an intention to part with any part or portion of such rights will not be presumed, "unless clear and special words are used to denote it." (*Martin* v. *Waddell*, 16 *Peters*, 369.) In the case of *The Royal Fishery of Banne*, (*Davies' Rep.* 149,) it was resolved, "That any navigable river, so far as the sea ebbs and flows, is a royal river, and the fishery in it is a royal fishery belonging to the king by his prerogative, because such river participates of the nature of the sea, and is said to be a branch of the sea, so far as it flows." "That no part of the royal fishery could pass by the grant of the land adjoining by the general grant of fisheries, for this royal fishery is not appurtenant to the land, and general words in the king's patent shall not pass such special royalty which belongeth to the crown by prerogative." The common law rights of navigation and fishery

are classed amongst those public rights denominated *jura publica* or *jura communia*, and thus are contradistinguished from *jura coronæ*, or private rights of the crown.    They are held by the sovereign in trust for and as the representative of the people.

I conclude, for these reasons, that the title to the lands under the waters of Northport Harbor in Long Island Sound is not in the town of Huntington; that the inhabitants thereof have not the exclusive right to take fish therein; and that the justice who tried this action was right in refusing to instruct the jury as requested by the defendant's counsel.

Judgment upon the verdict should be entered for the plaintiff.

[ORANGE GENERAL TERM, September 9, 1861. *Emott, Brown* and *Scrugham,* Justices.]