THE PEOPLE OF THE STATE OF NEW YORK, Respondents, *v.* THE NEW YORK AND STATEN ISLAND FERRY COMPANY, Appellant.

Public grants to individuals, under which rights are claimed in impairment of public interests, are to be construed strictly against the grantee.

The title to lands under tide-water in this country, which, before the revolution, was vested in the king, became, upon the separation of the colonies, vested in the States within which they were situated; and the State legislatures may exercise the same powers which, previous to the revolution, could have been exercised by the king alone, or by him in conjunction with parliament, subject only to the restrictions imposed by the Constitution of the State and of the United States.

The legislature of the State may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide-waters, or authorize a use inconsistent with public rights, subject to the paramount control of congress.

A grant of land under tide-water, made pursuant to the act of 1813 (chap. 74, Laws of 1813), as amended in 1815 (chap. 199, Laws of 1815), gives to the grantee a title to the soil, but does not authorize an interference with the public right in the waters. Such grants are made in the interest of commerce, and operate as a license to the grantee to erect wharves and piers upon the lands granted, which those interests require.

The grantee, by virtue of his proprietary interest, can exclude any other person from the permanent occupation of the land granted; but the State does not by the grant divest itself of the right to regulate the use of the granted premises in the interest of the public, and for the protection of commerce and navigation.

Under and in pursuance of said acts letters patent were issued to G. granting to him a piece of land, described therein, under tide-water in New York bay, to have and to hold " as a good and indefeasible estate of inheritance forever." No words were contained in the grant excluding the exercise by the State government of control of the water above the land granted. Prior to the passage of the act of 1857 (chap. 763,

Statement of case.

Laws of 1857) establishing bulk-head and pier lines for the harbor of New York, the second section of which prohibits the filling in, in the waters of the port beyond the bulk-head lines, excepting piers of a width and with an intervening water space specified, and prohibits the extension of piers beyond the pier lines, no piers had been erected on the land granted to G. *Held,* that the act was a lawful exercise of legislative powers; that the owners of the G. grant were bound to observe it, and in erecting piers to conform to its directions.

The said section was not repealed by the third section of the act of 1860 (chap. 522, Laws of 1860) changing the bulk-head and pier lines in a portion of the harbor. The words with which said third section begins, to the effect that the act of 1857 "is amended so as to read as follows," relate only to the particular change mentioned in the succeeding clause.

About 1865 the grantees of a portion of the land covered by the grant to G. erected a wharf or pier thereon of more than the width prescribed by the act of 1857 with an arm projecting laterally from the end thereof. Defendant having acquired the title of G. to an adjoining portion of the grant, commenced erecting a pier thereon adjoining the pier already erected, without leaving any intervening water space, and extending beyond the established bulk-head line; and at the end thereof and outside the line of the G. grant erected a club-house. In an action to restrain the completion of the structure and to compel its removal, *held,* that the erection of the club-house was not authorized in the act of 1857, and was a purpresture; that the structure erected prior to that of defendant's was a pier within the meaning of the act of 1857, although it exceeded the lawful width, and had an arm or extension thereto; and that plaintiffs were entitled to judgment declaring the structures erected by defendant unlawful, and directing their removal.

Plaintiffs were granted an extra allowance of five per cent on the value of defendant's pier. *Held,* error; that the subject-matter in controversy was the right to erect the structure, and not the value of the erections, in which plaintiffs claimed no right of property.

*People* v. *N. Y. and S. I. Ferry Co.* (7 Hun, 105) reversed as to extra allowance.

(Argued November 22, 1876, decided January 16, 1877.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department affirming a judgment in favor of plaintiffs, entered upon a decision of the court on trial at Special Term. (Reported below, 7 Hun, 105.)

This action was brought by the attorney-general in the name of the people to restrain the completion of a pier and other structures being erected by defendant, extending from the shore of Staten Island into the bay of New York, and to com-

pel the removal of so much as had already been erected. The grounds upon which the relief was sought were, 1st. That said pier does not leave an intervening space of at least 100 feet between it and the pier adjoining upon the south, as required by section 2, chapter 763, Laws of 1857; 2d. Because a portion of said pier on which is erected a club-house extends into the bay beyond the grant under which defendant claims.

On the 11th day of March, 1818, the people of the State of New York, by letters patent of that date, granted unto John Gore the lands under water in front of the adjacent uplands owned by him on Staten Island, beginning at low-water mark and extending out into the bay 500 feet. The grant to Gore covers the land claimed by the defendant and also those claimed by the Staten Island Railway Company, the former possessing the northern part thereof and the latter the southern.

The further facts appear sufficiently in the opinion.

*Homer A. Nelson* for the appellant. Defendant's title to the land under water was indefeasible and irrevocable, and the State could only deprive it of the property or its use by the exercise of the right of eminent domain. (*Fletcher* v. *Peck*, 6 Cranch, 89; *U. S.* v. *Min. and N. W. R. R. Co.*, 18 How., 241; *Hooper* v. *Scheimer*, 23 id., 235; *Ferrett* v. *Taylor*, 9 Cranch, 43; *Bagnall* v. *Braderuk*, 13 Pet., 436; *U. S.* v. *Stone*, 2 Wal., 535; *Lansing* v. *Smith*, 8 Cow., 146; 4 Wend., 9; *Gould* v. *H. R. R. R. Co.*, 6 N. Y., 522; *People* v. *Tibbetts*, 19 id., 526; *Benson* v. *Mayor, etc.*, 10 Barb., 223; *People* v. *Platt*, 17 J. R., 195; 6 Cranch, 136; *Wynehamer* v. *People*, 13 N. Y., 392; *People* v. *Toynbee*, 20 Barb., 168.) The provision in the judgment for extra allowance was erroneous. (*Atl. Dock Co.* v. *Libby*, 45 N. Y., 499; *Weeks* v. *Southwick*, 12 How. Pr., 179; *Strong* v. *Snyder*, 6 id., 11 *People* v. *Flagg*, 25 Barb., 652; *People* v. *A. and Vt. R. R. Co.*, 16 Abb., 465.)

*Julien T. Davies* for the respondents. The grant by the State to Gore in 1818 did not relieve the lands thereby conveyed from the operation of chapter 121, Laws of 1855; chap-

ter 763, Laws of 1857, and chapter 522, Laws of 1860; *Attorney-General* v. *Burridge*, 10 Price, 360, 372; Wood on Nuisances, § 97, pp. 99, 627; *Williams* v. *Wilcox*, 8 Ad. & El., 314; Woolrych on Water Rights, 78 Law Lib., chap. 1, p. 29; chap. 2, pp. 196–198; Phear on Rights of Water, 100; id., 35, 38, 40; *Rogers* v. *Jones*, 1 Wend., 261; *Brink* v. *Richtmeyer*, 14 J. R., 255; Angell on Tide Waters, 64; 1 Hoffman on Estate and Rights of Corp. of N. Y., 224; *People* v. *Vanderbilt*, 26 N. Y., 286; 28 id., 396; *Shaw* v. *Crawford*, 10 J. R., 236; *People* v. *Platt*, 17 id., 213; *Loundes* v. *Dickerson*, 34 Barb., 586, 593; *People* v. *Roper*, 35 N. Y., 639; *Lansing* v. *Smith*, 8 Cow., 146; 4 Wend., 9; *Hooker* v. *Cummings*, 20 J. R., 90; *Canal Comrs.* v. *People*, 5 Wend., 423, 448; *Ex parte Jennings*, 6 Cow., 518; *People* v. *Laimbeer*, 5 Den., 15; *People* v. *Gutchess*, 48 Barb., 656; *People* v. *Cunningham*, 1 Den., 524; *Conklin* v. *Phœnix Mills*, 62 Barb., 299; *Congreve* v. *Smith*, 18 N. Y., 79; *Hart* v. *Mayor, etc.*, 9 Wend., 571, 584; *D. and H. Co.* v. *Lawrence*, 2 Hun, 163, 168; *Gilman* v. *Philadelphia*, 3 Wal., 724; *Gould* v. *H. R. R. R. Co.*, 6 N. Y., 522; *Davis* v. *Mayor, etc.*, 14 id., 506, 524; *Beekman* v. *S. and S. R. R. Co.*, 3 Paige, 45; *Bloodgood* v. *M. and H. R. R. Co.*, 18 Wend., 9; *Dutton* v. *Strong*, 1 Bl., 23; *Yates* v. *Milwaukee*, 10 Wal., 497; *Rosevelt* v. *Goddard*, 52 Barb., 533; *Russell* v. *Mayor*, 2 Den., 461; *Smith* v. *Livenus*, 4 Seld., 472; *Seward* v. *Beech*, 29 Barb., 239; *Mayor* v. *Lord*, 17 Wend., 285, 290; *Vanderbilt* v. *Adams*, 7 Cow., 349; *Radcliffe* v. *Mayor, etc., of Bklyn.*, 4 N. Y., 205.) The railroad company's structure was a pier within the act of 1857, and being first erected, its owners and the public had a right to a clear intervening water space of 100 feet between it and any other piers subsequently erected. (*Mead* v. *N. W. Ins. Co.*, 7 N. Y., 530; *Pollen* v. *Le Roy*, 30 id., 549; *Child* v. *Sun Mut. Ins. Co.*, 3 Sand., 26; *Hart* v. *Mayor, etc.*, 9 Wend., 575; *Stevens* v. *Rhinelander*, 5 Robt., 301; *N. Y. and Bklyn. Ferry Co.* v. *Smith* [unreported]; *Thompson* v. *N. Y. and H. R. Co.*, 3 Sand., 625.) Defendant's outermost structure is a purpresture, and as such is a nuisance,

*per se*, and should be removed. (*People* v. *Vanderbilt*, 26 N. Y., 286; Wood on Nuisances, 604; *Bd. Comrs. of Pilots* v. *Clark*, 33 N. Y., 251; *Bd. Comrs. of Pilots* v. *Erie R. Co.*, 5 Robt., 366.) All land under water in the bay of New York is to be presumed to be the property of the State until the contrary is shown. (*Rogers* v. *Jones*, 1 Wend., 237; *East Haven* v. *Hemingway*, 7 Conn., 196; *Lansing* v. *Smith*, 4 Wend., 9; *Attorney-General* v. *Parmeter*, 10 Price, 378; Const., § 11, art. 1; § 69, art. 4, tit. 5, chap. 9, pt. 1, R. S.; § 1, tit. 1, chap. 1, pt. 1, R. S.; *Blundell* v. *Catterall*, 5 B. & Ald., 268.) The extra allowance to plaintiffs was proper. (*People* v. *A. and Vt. R. R. Co.*, 16 Abb. Pr., 465; *Devlin* v. *Mayor, etc.*, 15 id. [N. S.], 31; *Burke* v. *Candee*, 63 Barb., 552; *People* v. *Vanderbilt*, 26 N. Y., 287; 38 Barb., 282; *Osborne* v. *Betts*, 8 How., 31; *Dyckman* v. *McDonald*, 5 id., 121; *Mann* v. *Tyler*, 6 id., 235; *S. and W. R. R. Co.* v. *McCoy*, 9 Abb. Pr., 339; Code, § 309; *Mitchell* v. *Hall*, 7 How., 490; *Wetherhead* v. *Allen*, 28 Barb., 661; *Johnson* v. *Carnley*, 10 N. Y., 570; *Ingersoll* v. *Bostwick*, 22 id., 425; *Mayor, etc.*, v. *Lyons*, 1 Daly, 296.)

ANDREWS, J. It will contribute to a clear understanding of the questions involved in this controversy to consider, in the first place, the rights acquired by John Gore under his grant, from the State, of March 11, 1818, of lands under water on the eastern shore of Staten Island, which grant includes the premises now owned by The New York and Staten Island Ferry Company. The letters patent are referred to in the printed case, but are not set out in full; but it was assumed upon the argument, and it is unquestionably a fact, that the grant was made pursuant to chapter 74 of the Laws of 1813, as amended by chapter 199 of the Laws of 1815, which authorized the commissioners of the land office to grant to the proprietor or proprietors of the adjacent lands so much of the land under the waters of navigable rivers and lakes, and under the waters adjacent to and surrounding Staten Island, "as they shall deem necessary to promote the commerce of the State."

The grant to Gore was of a piece of land seventeen chains and fifty links in width, bounded on the west by low water mark, and extending east into the bay a distance of 500 feet, and following the description of the granted premises in the conveyance are the words "to have and to hold the above described and granted premises unto the said John Gore, his heirs and assigns, as a good and indefeasible estate of inheritance forever."

Gore was the owner of the upland adjoining the lands under water embraced in the grant. The ownership of the adjacent upland, however, gave him no title to or interest in the lands under water in front of his premises. The title to lands under tide-waters, within the realm of England, were, by the common law, deemed to be vested in the king as a public trust, to subserve and protect the public right to use them as common highways for commerce, trade and intercourse. The king, by virtue of his proprietary interest, could grant the soil, so that it should become private property, but his grant was subject to the paramount right of public use of navigable waters, which he could neither destroy or abridge. In every such grant there was an implied reservation of the public right, and so far as it assumed to interfere with it, or to confer a right to impede or obstruct navigation, or to make an exclusive appropriation of the use of navigable waters, the grant was void. In the treatise De Jure Maris (p. 22) Lord HALE says : " The *jus privatum* that is acquired to the subject, either by patent or prescription, must not prejudice the *jus publicum,* wherewith public rivers and arms of the sea are affected to public use;" and Mr. Justice BEST, in *Blundell* v. *Catterall* (5 B. & A., 268), in speaking of the subject, says : " The soil can only be transferred subject to the public trust, and general usage shows that the public right has been excepted out of the grant of the soil." In *Williams* v. *Wilcox* (8 A. & E., 314), the plaintiff claimed a right to maintain a weir in the river Severne, which had become an obstruction to navigation, under a royal grant made before the reign of Edward I, and the court held that no valid grant for that pur-

pose could be made by the crown, either before or after Magna
Charta, but the action which was trespass, for throwing down
the weir was sustained on the ground that the weir had been
legalized by 4th Statute 25, (Ed. 3, C. 4); see, also, *Attorney-
General* v. *Parmeter* (10 Price [Exch.], 378.)

The principle of the common law to which we have adverted
is founded upon the most obvious principles of public policy.
The sea and navigable rivers are natural highways, and any
obstruction to the common right, or exclusive appropriation
of their use is injurious to commerce, and if permitted at the
will of the sovereign, would be very likely to end in materially
crippling, if not destroying it.   The laws of most nations
have sedulously guarded the public use of navigable waters
within their limits against infringement, subjecting it only to
such regulation by the State, in the interest of the public as
is deemed consistent with the preservation of the public right.
But while the sovereign can make no grant in derogation of
the common right of passage over navigable waters, parlia-
ment may do so.   This is clearly shown by the case of
*Williams* v. *Wilcox* (*supra*), and is well settled by authority.
(*Rex* v. *Montague* 4 B. & C., 598 ; Angel on Tide Waters, 85.)
But a person claiming a special right in a navigable river or
arm of the sea under a grant by parliament, as for example, a
right to obstruct it, or to interfere in any way with the public
easement, must show a clear title.   It will not be presumed
that the legislature intended to destroy or abridge the public
right for private benefit, and words of doubtful or equivocal
import will not work this consequence.   Public grants to
individuals under which rights are claimed in impairment of
public interests are construed strictly against the grantee, for
it is reasonable to suppose that if they were intended to have
this operation, the intention would have been expressed in
plain and explicit language. (*People* v. *Laimbier*, 5 Den., 15 ;
*Rowndes* v. *Dickerson* 34 Barb., 586 ; Broom's Maxims, 583,
and cases cited.) The title to lands under tide-waters in
this country which before the revolution was vested in
the king, became, upon the separation of the colonies,

vested in the States within which they were situated. The people of the State in their right of sovereignty succeeded to the royal title, and through the legislature " may exercise the same powers, which, previous to the revolution, could have been exercised by the king alone, or by him in conjunction with parliament; subject only to those restrictions which have been imposed by the Constitution of the State, and of the United States." (Chancellor in *Lansing* v. *Smith*, 4 Wend., 9.) The public right in navigable waters was in no way affected or impaired by the change of title. The State, in place of the crown, holds the title, as trustee of a public trust, but the legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide-waters, or authorize a use inconsistent with the public right, subject to the paramount control of congress, through laws passed, in pursuance of the power to regulate commerce, given by the federal Constitution. (*Rogers* v. *Jones*, 1 Wend., 261; *Gould* v. *H. R. R. R. Co.*, 6 N. Y., 522; *The People* v. *Tibbetts*, 19 N. Y., 523.)

If an exclusive right, in abridgment of the *jus publicum*, is claimed by an individual, under a statute or a public grant, the rule of strict construction, to which we have referred, applies, and he must be able to show clear warrant of law in support of his claim, and inferences or implication will not be indulged in to sustain it. The grant to Gore in 1818 was authorized by law, and he acquired thereby the title to the soil under water, embraced within the grant; but there is nothing in the words of the grant, or in the statute, which authorized it, indicating any purpose of interfering with the public right in the waters of the bay. The grant was made in the interest of commerce, as the statute authorizing it clearly shows, and was accepted by Gore in this view. How the interests of commerce would be promoted by grants of lands under water, to the owners of the adjacent land, does not appear from any thing contained in the statutes, under which they are made. But it is not difficult to find reasons to justify such grants, as being made in the interests of com-

merce and navigation. These interests require that wharves and landing places should be provided for the mooring, loading and unloading, of vessels, and they are necessary, and, indeed, indispensable adjuncts and incidents to commerce, and, without them, commerce and intercourse would be greatly embarrassed and restricted.

The extent of the bay and harbor of New York, and the adjacent coast line, and of the Hudson river, within the ebb and flow of the tide, penetrating, for a long distance, into the interior of the State, renders it impracticable for the State to erect wharves and piers for the accommodation of commerce, and their erection by the owners of the adjacent upland, on the soil of the State, under tide-water, would constitute a purpresture, for which a remedy by abatement could be had by a proceeding in behalf of the people. (*People* v. *Vanderbilt*, 26 N. Y., 287.)

This objection is removed where the State has granted the land under the act of 1813. The grant operates as a license from the State to the grantee to erect wharves and piers upon the lands granted. This is according to the general understanding, and is the practical construction of grants made under the act. The grantee acquires the title to the soil and the State cannot annul the grant, and the grantee, by virtue of his proprietary interest, can exclude any other person from the permanent occupation of the land granted, and wharves and piers erected by the grantee upon the land embraced in the grant, are not *per se* a nuisance. But the State does not, by a grant made under the act of 1813, divest itself of the right to regulate the use of the granted premises in the interest of the public and for the protection of commerce and navigation. The grant is subordinate to the paramount right of the public, and it is one of the important functions and duty of the State to protect public highways against obstruction and encroachment to the injury of the people.

The grant to Gore contained no words excluding the exercise, by the State, of governmental control of the waters above the land granted, as a public highway, and if, in exercising this

control, the grantee is restricted in the use of his property, it is not in contravention of the grant, but consistent with it, because the grant, by well-settled words of construction, was subject to the exercise of this right and attribute of sovereignty. We need not inquire what the rights of a grantee would be in respect to piers and wharves, erected under the license implied from the grant before it had been revoked, or the State had, in the exercise of its discretion, made regulations upon the subject.

The legislature, by chapter 763 of the Laws of 1857, entitled "An act to establish bulk-head and pier lines for the port of New York," established pier and bulk-head lines for the port and harbor of New York which included the premises granted to Gore. The second section is as follows : "It shall not be lawful to fill in with earth or other solid material in the waters of said port beyond the bulk-head line, or line of solid filling hereby established, nor shall it be lawful to erect any structure exterior to the said bulk-head line, except the sea wall mentioned in the first section of the act, and piers which shall not exceed seventy feet in width respectively with intervening water spaces of at least 100 feet, nor shall it be lawful to extend such pier or piers beyond the exterior or pier line, nor beyond or outside of said sea wall."

When this act was passed no piers had been erected on the Gore grant, and, so far as appears, there was unity of title as to the whole tract embraced therein. This act was a lawful exercise of legislative power, as a regulation for the benefit of commerce and navigation, and the owners of the Gore grant were bound to observe it, and in erecting piers to conform to its directions.

In 1865, or soon after, the grantees of Gore of a part of the land covered by the grant erected a pier on their premises extending easterly into the waters of the bay to a point forty-two feet and five inches outside of the bulk-head line, as established, eighty-one feet wide ; and at its south-easterly corner, and on a line with the end of the pier, an arm was constructed twenty-four feet wide, extending southerly eighty-

three feet, for greater convenience in securing boats running to and from the landing. This pier subsequently became the property of the Staten Island Railway Company, a corporation engaged in operating a railroad on Staten Island and in running ferry-boats between Staten Island and New York and other points. In 1875 the defendant The New York and Staten Island Ferry Company having acquired Gore's title to one hundred feet of the land covered by his grant, adjoining on the north the land of The Staten Island Railway Company, commenced erecting a pier on their premises immediately adjoining the pier of the railway company without leaving any intervening water space and extending far beyond into the waters of the bay and outside of the bulk-head line established by the act of 1857, and at the end of their structure and outside of the bulk-head line and the line of the Gore grant erected a club-house, which was connected with the pier proper by a trestle bridge, and had nearly completed their structure when this action was commenced.

This action is brought to enjoin the completion of the structure and compel its removal. The erection of the defendant was a clear violation of the act of 1857. The act prohibited the erection of piers without leaving an intervening water space of one hundred feet.

The pier of the Staten Island Railway Company was first erected and the defendant could not erect a pier within the distance specified in the act. We have nothing to do with the consideration upon which the legislature proceeded in making this prohibition, it is sufficient that it was made in a lawful exercise of legislative authority. It would be easy to suggest reasons to justify this legislation, but into this question we are not bound to enter.

The erection of the defendant was, therefore, unlawful, unless the structure of the railway company was not a pier, within the meaning of the act of 1857, for the reason that it exceeded by eleven feet the width allowed by the statute, and by reason of the arm or extension southward. That it was a pier is found as a fact, and there is no ground to ques-

tion this conclusion. That it exceeded the lawful width is conceded. The State can proceed to have it reduced to the lawful limit, but if this was done it would still leave the defendants' structure within the prohibited distance. We are of opinion that a pier exceeding the lawful width is unlawful only so far as it exceeds the width allowed, and that the fact that the pier of the railway company was wider than was authorized, did not deprive it of the character of a pier, or release the defendants from the charge of erecting an unlawful structure.

There is no ground for the suggestion that the second section of the act of 1857 was repealed by the third section of the act chapter 522 of the Laws of 1860. That act is entitled " An act to prevent encroachments and obstructions in the harbor of New York, and to authorize their removal, and to correct the harbor commissioners' lines." The first and second sections confer certain powers upon the board of commissioners of pilots, for the prevention and removal of obstructions in the harbor. The third section changes the bulk-head and pier line, established by the act of 1857, in a portion of the East river and Westchester county, and it is manifest that the words with which the section commences, viz. : " The act entitled, etc., passed April 17, 1857, is hereby amended so as to read as follows," relate only to the particular change mentioned in the succeeding clause. The act of 1857 was regarded as in force, when the case of *The People* v. *Vanderbilt* came before the court in 1863, as will appear by the opinions in that case.

We agree with the conclusions of the Special and General Terms, that the erection of the club-house on the land of the State was not authorized by the act of 1857, and was a purpresture. We are of opinion that no error was committed on the trial in the admission of evidence, and that the people were entitled to judgment, declaring the structures erected by the defendant to be unlawful, and directing their removal. (*People* v. *Vanderbilt, supra.*)

The order granting an extra allowance of costs to the plain-

tiff of five per cent on $22,600, the value of the defendants' pier, which they are directed by the judgment to remove, was not, we think, authorized by section 309 of the Code. The subject-matter involved in the controversy was the right to erect the structure and not the title to the materials, or the value of the erections. The plaintiff claimed no right of property in them.

The judgment must be modified by striking out the extra allowance, and, as so modified, affirmed.

All concur.

Judgment accordingly.