WEST VIRGINIA PULP AND PAPER COMPANY OF DELAWARE, Plaintiff, *v.* DUNCAN W. PECK, Individually and as Superintendent of Public Works of the State of New York, WILLIAM H. HICKEY, Individually and as Division Superintendent of the Champlain Canal, and JOHN SKELLY, Defendants.

(Supreme Court, Saratoga Special Term, July, 1918.)

Constitutional law — statutes — water and water courses — lands under water — navigable waters — injunctions — Barge canal — Laws of 1882, chap. 406; Laws of 1900, chap. 683; Laws of 1909, chap. 273, § 4.

The title to the bed of the Hudson river at Mechanicville is in the state.

A statute (Laws of 1882, chap. 406), by which plaintiff's predecessor was authorized to construct a dam across the Hudson river at Mechanicville " on their own lands " in such manner as not to affect injuriously the water privilege at Stillwater village, etc., not having been passed by the vote required for a conveyance of state property, gave a mere license or privilege to erect the dam, subject to public navigation rights and the

reserved right of the state to improve the navigation of the river and to prevent and remove obstructions therein.

A statute (Laws of 1900, chap. 683), which received the votes necessary for a conveyance of state property by its title, referred only to the subject of legalizing and maintaining the then existing dam erected pursuant to the statute of 1882, while the body of the later act in addition to such legalization authorized plaintiff's predecessor to forever maintain the dam and to flood back up the river so far as plaintiff's predecessor then owned adjacent uplands, or had rights of flowage thereon, for the purpose of maintaining the pond formed thereby, and granted any interest of the state in lands under water of the river covered by the dam and the buildings and plant of plaintiff's predecessor connected therewith. *Held,* that the statute of 1900 was in violation of article 3, section 16, of the Constitution, which provides that no private or local bill shall embrace more than one subject to be expressed in the title, and was also void as, an attempt to alienate the sovereign right of the state to improve the navigation of the river.

The route of the Barge canal under the statute is in the bed of the river and through the dam. Before the plan for the work was made plaintiff raised the crest of the dam to elevation 67.5 and the state engineer adopted such elevation as a basis for the locks and other structures and a contract for the work which was designed as and was an improvement of the river for navigation was approved by the canal board. On the date that such work was practically completed plaintiff put flash boards on the dam and raised its elevation to 70.0 at which elevation the locks cannot be operated except during low flows and cannot be operated at all with a flow near or at the maximum navigable stage, nor were they designed to withstand the pressure at that elevation. In an action brought to restrain any interference with the dam and the flash boards thereon, *held,* that said dam, including the flash boards as forming part of it, was not a "structure" within the meaning of section 4 of chapter 273 of the Laws of 1909, requiring appropriation and compensation therefor.

That the flash boards were not authorized and the dam to that extent at least was an unlawful structure, which, if not removed, would have impeded and obstructed navigation, and plaintiff having refused, after demand, to remove them, defendants were warranted in removing them as unlawful.

Supreme Court, June, 1918. [Vol. 104.

ACTION for an injunction.

Robert Frazier and George M. McKellar, for plaintiff.

Merton E. Lewis, Attorney-General (Edward J. Mone and John D. Monroe, Deputies Attorney-General, of counsel), for defendants.

WHITMYER, J. The action has been brought to restrain defendants from entering upon and interfering with a dam and the flash boards thereon, built by plaintiff across the Hudson river at Mechanicville, Saratoga county, N. Y. The dam is anchored to uplands owned by plaintiff on each side of the river, those of the westerly side being in the town of Stillwater in said county, and those on the easterly side in the town of Schaghticoke, Rensselaer county. Plaintiff's mills are on the westerly side. The dam is located about 3,650 feet northerly of the mouth of Anthony's kill, which flows into the river from the west, and about 9,000 feet southerly of the mouth of Schaghticoke creek or Hoosick river, which flows into the river from the east. It was built in 1882 by the Hudson River Water-Power and Paper Company, after the passage on July 1, 1882, of chapter 406, Laws of 1882, and was completed on February 22, 1883. Section 1 of the act is material here and reads as follows: " The Hudson River Water-Power and Paper Company are hereby authorized to construct a dam across the Hudson river at Mechanicville, on their own lands, in such manner as not to injuriously affect the water privilege at Stillwater village as it now exists, or any water privilege now existing and in use on said river between Stillwater village and the lands of the Hudson River Water-Power and Paper

Company without an agreement with the owner or owners of such rights; and to connect the waters of said river with the Champlain canal, by the construction of locks, upon such plans as may be approved of by the state engineer and the superintendent of public works.'' Three-fifths of the legislature were present at the time of the passage of the act. It did not receive a two-thirds vote. Thereafter and on April 25, 1900, chapter 683, Laws of 1900, was passed by a two-thirds vote. The title and section 1 are material. The title reads: ''An Act to legalize the erection and maintenance of the dam heretofore erected by the Hudson River Water-Power and Paper Company, now known and designated as the Duncan Company, across the Hudson river at Mechanicville, Saratoga county.'' And section 1, so far as material, reads: '' The erection of the dam heretofore built by the Hudson River Water-Power and Paper Company, the name of which has since been changed to The Duncan Company, across the Hudson river at Mechanicville * * * is hereby legalized and said company is hereby authorized to forever maintain said dam and flood back up said river so far as it now owns the adjacent uplands or may have rights of flowage thereon, for the purpose of maintaining the pond formed by such dam; and any interest of the state in the lands under the waters of said river, covered by said dam and the buildings and works of said company connected therewith, is hereby granted to said Duncan Company.'' As constructed, the dam was 16 feet high, 796 feet long, and its crest was at elevation 64.5 Barge canal datum. The crest was maintained at that elevation until August, 1904. At that time, having acquired whatever rights the Duncan Company had had, plaintiff raised the crest to elevation 67.5 Barge canal datum, and maintained it at that elevation, without flash

boards, until about August 1, 1912. At that time, it put on boards and raised the crest to 70 Barge canal datum. The boards went off with high water and plaintiff thereafter put on other boards, which remained until June 29, 1913, when defendants removed them, claiming that the Barge canal work in that vicinity was endangered thereby, and the action was commenced. The only interference, alleged in the complaint, relates to the removal of the flash boards. Plaintiff claims (1) that the river at the *locus in quo* has always been and is non-navigable; (2) that the state never owned any part of the bed upon which the dam is erected or which is overflowed by the pond above the dam, but that such part of the bed was granted by the English government before the existence of the state; (3) that such part of the bed is owned by plaintiff, under a title, which is not based upon a state grant; (4) that plaintiff's predecessors and plaintiff at all times had and that plaintiff has the right to maintain the dam without interference, except in the manner and under the conditions prescribed by the Barge Canal Act, because of their ownership of the bed of a non-tidal and non-navigable river; and (5) that the dam is a lawful structure. It should be noted that plaintiff does not claim ownership of the bed under the acts above set forth, although the decision at Special Term denying its application for an injunction *pendente lite* was based upon that theory. *West Virginia Pulp & Paper Co.* v. *Peck,* 82 Misc. Rep. 72. And plaintiff states that the acts were placed in evidence merely as part of the proof that the state has always recognized the ownership in plaintiff and its predecessors of the bed upon which the dam is built and that the dam is a lawful structure. Much has been said about the navigability of the river at the place in question, but

consideration of that is useless here, in view of the decisions. *People ex rel. Loomis* v. *Canal Appraisers,* 33 N. Y. 461; *Canal Appraisers* v. *People,* 17 Wend. 571; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Coms.,* 168 U. S. 349; *Morgan* v. *King,* 35 N. Y. 454; *Fulton L., H. & P. Co.* v. *State of New York,* 200 id. 400; *Williams* v. *City of Utica,* 217 id. 162; *Danes* v. *State of New York,* 219 id. 67. In the *Danes* case the Court of Appeals decided that the Mohawk is navigable and said that it is not necessary in order to be navigable that a river should be deep enough to admit the passage of boats at all portions of the stream. What was said about the Mohawk there is applicable to the Hudson here. That brings us to the question of the title to the bed. That involves the consideration of several patents. The first is Dongan's patent for Saratoga, dated November 4, 1684, from Thomas Dongan, governor of New York, on behalf of the Duke of York, lord proprietor of the province, to Cornelis Van Dyke, and others, which described the purchase as follows: " A Certaine Tract or Parcell of Land Scituate lyeing and being to the North of Albany on both sides of Hudsons River beginning at the uppermost limits of the Land bought formerly by Goose Garretsen and Phillip Peterse Schuyler being a Creeke called Tioneen de houwe which is the Southermost Bounds of the said Lands and from thence up both sides of the River Northerly to a Creeke or Kill on the East side of the River called Tionoon de houwe the land on said Creeke Included keeping the same length on the West side of the River and soe Runnes East and West into the woods as farr as the Indians Right and Title to the within mencioned Land afore recite as by a Certains Writeing or Indian Deed bearing Date the 26th Day of July in the thirty fifth Yeare of his Maties Reigne 1683

12

Relacon being thereunto had doth more fully and at Large appears,'' and granted, ratified and confirmed to said patentees, their heirs and assigns forever, '' All the before recited Tract and Tracts, Parcell and Parcells of Land and Islands within the said Bounds Together with all and Singular Woods Underwoods Water Runnes Streames Ponds Creeks Meddows Marshes Fishing Hawking Hunting and Fowling and all other Libertyes Priviledges Heriditaments and Appurtts to the said Tract of Land and Premisses belonging or in any wise Appertaining.'' The '' Tioneen de houwe '' is now known as ''Anthony's kill.'' '' Tionoon de houwe '' should have been '' Dionoon de houwe '' and is now known as the '' Batten Kill.'' Plaintiff says that the description is '' up both sides of the river,'' but that the north and south lines cross the river and that the river bed is included. The description does not bound the grant by lines or by adjoining properties. It defines a tract of land on both sides of the river and running from the river into the woods on each side. And the words '' and soe Runnes East and West into the woods '' refer to the tract and not to the north and south lines. Otherwise, they refer only to the northerly boundary and the southerly boundary on the east side of the river is not given. The bed of the river was not expressly conveyed, nor was it within any lands described by metes and bounds. The language is similar to that of the patent for Van Rensselaer's Manor, where the tract was described as '' lyeing and being on or upon the Banks of Hudsons River   *   *   *   extending northwards up along both sides of Hudsons River into a place heretofore called the Kahoos or the Great falls of the said River & extending its selfe East and West all along from Each side of the said River backwards into the woods twenty fouer English Miles.'' That language was construed

in *People* v. *Page,* 39 App. Div. 110, and it was held that whatever was between the east and west banks of the river was excluded and not within the bounds of the grant, unless the bounds on either side went to the center of the stream by implication, but that such a construction was not permissible within the decisions relating to the Mohawk and to the Hudson above tidewater. And it was held that the general clause following the description, " together with all and Every the Iles and Rivers Creeks Runns of Waters Mines Mineralls," did not operate, as against the state, to convey lands under water not within the boundaries of the grant. To the same effect are the cases of *Canal Appraisers* v. *Tibbitts,* 17 Wend. 608, also relating to Van Rensselaer's Manor patent, and *Matter of Brookfield,* 176 N. Y. 138. The Dongan patent, therefore, did not include the river bed. However, plaintiff relies mainly on the Cornbury, also called the Queen Anne Patent. This was dated October 29, 1708, was made by the English government through Lord Cornbury, governor of New York under Queen Anne, and runs to the patentees under the Dongan patent or to their successors. It recites (1) the grant under said patent of " a Certaine Tract of Land Scituate and being to the Northwards of the City of Albany on Both sides of Hudsons River the Limitts and Boundaries of which Land are as is herein after Particularly Sett forth and expressed;" (2) the partition of part of said lands near Schuylerville on April 15, 1685; (3) the petition, dated November 19, 1707, by said patentees for a " Grant & Confirmacon for the said Tract of Land and Premisses before manconed as the same are herein after Particularly Bounded," and (4) gives, grants, releases, ratifies and confirms unto said patentees and their heirs and assigns as follows: " All the sd Tract of Land & Premises before

menconed Limitted and Bounded as followeth (that is to say) Beginning att the south side of the Mouth of a Certaine Creeck on the West side of Hudsons River Comonly called by the Indians Tionoondehowe & by the Christians Anthonys Kill which is the uppermost Bounds of the Land formerly purchased by Goosen Gerrittse and Phillip Pieterse Schuyler and from thence extending westerly into the Woods by the said Creeck on the Sauth side thereof as it Runns Six English Miles and if the said Creeck Do not Stretch soe farr into the woods then from the end thereof West by a Straight Line untill it shall be Six Miles Distant from Hudsons River upon a Measured Straight Line and from thence Northerly by a Line Parallel to the Course of Hudsons River untill it Come Opposite to and bear West from the North side of another Creeks Mouth on the East side of Hudsons River Called Dionoondehowe which upon Hudsons River is Computded to be Distant from the Mouth of Tionoondehowe aforesaid about twenty two English Miles be it more or Less and from the Last Terminacon by a Straight Line to be Drawn East to the North side of the Mouth of the said Creeck Dionoondehowe and from thence Continued East Six Miles into the Woods on the East side of Hudsons River and from thence by a Line Southerly Parralell to the Course of the said Hudsons River and Six Miles Distant from the same soe farr Southerly untill it Come Opposite to and Bear East Six Miles Distant from the North side of the Mouth of Schaaokook Kill which is the Bounds of Schaaokook Patent Late belonging to Henry Van Renslaer Together with all and Singular the woods Underwoods Trees Timber ffeedings Meadows Marshes Swamps Pooles Ponds Waters Watercourses Rivers Rivoletts Runns and Streams of Water ffishing ffowling hunting hawking Mines and Minerals Stand-

ing Growing lyeing or being or to be had used or
enjoyed within the Bounds & Limitts aforesaid and all
other Proffitts beneffits Advantages Hereditaments
and Appurtenances wtsoever unto the said Tract of
Land and Premisses belonging or in any wise Appur-
teyning.'' Plaintiff claims that the specific boundary
lines of the property described in this patent include
the river bed between Anthony's kill and Batten kill
and that the general clause following expressly grants
the bed between these points. The description does
not close, but it stops in the northerly bounds of the
Schaackook or Van Rensselaer patent at a point six
miles easterly from the north side of the mouth of
Schaackook kill, now known as Schaghticoke creek or
Hoosick river, something like ten miles from the place
of beginning. The Van Rensselaer patent was given
March 29, 1698. By it, Benjamin Fletcher, governor
of New York under William III of England, granted
unto Hendryck Van Ranslaer '' one hundred acres of
Low land and all the wood land or upland within the
Limites and Bounds of a Certaine Tract or Parcell of
Vacant Land in the County of Albany Purchased
from the Indians by Lycence obtained from our said
Captain Generall and Governour in Chiefe in our
Councill at New Yorke Scituate lyeing and being on the
East side of Hudsons River along the said River
Bounded Southerly by the bounds of Eghbert Theunis-
sen Land Northerly by the Schachkook Creeke being
about six miles more or Lesse including the said Creeke
and extending Easterly from hudsons River between
the South and North Bounds six English miles.''
And Van Rensselaer conveyed this land to the city of
Albany by the same description on August 1, 1699. An
examination of the patent will show that the bed of the
river was not included, that the bed of the creek was
expressly included, and that the tract extended along

the river six miles and in from the river six miles. Notwithstanding the Van Rensselaer patent, plaintiff says that the failure to close the description in the Cornbury patent is unimportant and that the omitted line may be supplied by a straight line from the last point of the description to the point of beginning, or, if that is not permissible because of the grant under the Van Rensselaer patent, by running from the last point in the description around that patent until the point in a straight line from the last point is reached and thence to the place of beginning. In determining whether or not the straight line rule may be applied, the purpose of the Cornbury patent becomes important. On July 22, 1686, Governor Dongan granted to the city of Albany, in the charter given to the city, a license to purchase from the Indians '' five hundred acres of low or meadow land at a certain place called &ast; &ast; &ast; Schaahtecogue,'' to be located in such part of Schaahtecogue, or the land adjacent, as should be deemed by the city most convenient. On February 28, 1707, the city bought and received a deed of land at Schaghticoke from the Indian owners, '' bounded on ye west side by ye Said River on ye south side by ye bounds of Eghbert Teunise and Barent albertse Bratt and Runs northward along said Riverside to the End of two English miles from Schaahkooks Creek and stricks from thence into ye woods by an East line twelve miles and on the southside by a south East line fourteen miles or so much farther than ye line on ye East side doth Comprehend and take in ye third Carryeing place on ye Said Schaahkooks Creek, which Carryeing place is ye· outmost bounds of Sd Schaahkook lands Eastward.'' On September 23, 1707, the city presented a petition to Governor Cornbury for a confirmatory patent to include lands covered by said deed northerly and easterly of and not in the Van Rensselaer patent.

And on November 19, 1707, the Saratoga patentees presented a petition, which recited that the boundaries of their patent on the east and west are " presumed by some to bee unsertain " and " for avoiding all disputes that might happen thereby," prayed for a " patent of confirmation," restricting the same to the boundaries therein described.  The description in the petition is about the same as in the Cornbury or Queen Anne patent until the point six miles east from the Hudsons river, easterly from the north side of the mouth of the Dionoondehowe, is reached.  It then continues " and from thence Southerly on a paralell Line to the Course of hudsons River within the bounds of this patent until it comes so farr Southward as to bear south southeast from the South Side of the mouth of the aforesaid Creek called Tienoondehowe or Anthony's Kill on the West side of Hudsons river aforesaid and from thence on a Straight Line north northwest to the place where it first begunn."  The Saratoga patentees petitioned for a confirmatory patent to remove the uncertainty as to their east and west boundaries and the city of Albany petitioned for one to confirm its ownership of the lands, purchased from the Indians, northerly and easterly of and not in the Van Rensselaer patent.  The Saratoga patentees and the city were disputing about these lands.  Plaintiff speaks about a deed of the disputed lands from the former to the latter, but I find no evidence of one.  The result of the petitions was that only the east and west lines of the Dongan patent were defined, and the east one only to a point six miles easterly in a line from the north side of the mouth of Schaghticoke creek.  The lands claimed by the city were not defined.  It was unnecessary to close the description, considering the purpose, and it was not intended to close it.  On the east side of the river, the Dongan and Cornbury patents conveyed only

from the Dionoondehowe to the northerly bounds of Van Rensselaer patent, and the river bed, at least at the place in question, was not within the bounds of said patents, unless the line or lines necessary to reach the point of beginning may be supplied as plaintiff suggests. But, if so, it will be necessary to say that it was the intent to exclude the bed in making the Van Rensselaer grant and to include it in the later Cornbury patent. And it will be necessary to supply a line or lines for such a distance that it must be said to be an inclusion by implication. Nor do the general words which follow change the situation. Their operation was confined "within the Bounds & Limmitts aforesaid." *People* v. *New York & Staten Island F. Co.,* 68 N. Y. 71; *Sage* v. *City of New York,* 154 id. 61, 81. The description is not of that definite character required to warrant a finding that the bed was included. *Williams* v. *City of Utica, supra; Danes* v. *State, supra.* In the *Williams* case it was conceded that the bed there was within the bounds of the grant. Moreover, the chain of title from the patentee to the plaintiff was complete. Here, plaintiff has been unable to connect its title with the patents and has been compelled to rely upon recent deeds. Those on the west side date back to 1845 and not one expressly includes the bed. Those on the east side date back to 1843 and were expressly limited to the bank or to low water mark, except a quitclaim deed of the bed on that side, obtained by plaintiff in 1911, after the appropriation of the uplands there and while work was going on at this point, for the sum of ten thousand dollars, from the heirs of a man, from whom deeds had been taken in 1881 and 1883, expressly limited to low water mark. And the verified answer of the company which built the dam, in an action, in 1887, involving the question of the right to maintain it

at the then height, alleged that it was erected pursuant
to chapter 406, Laws 1882, that the Hudson river was
and is a navigable stream, and that the bed and banks
thereof to high water mark were and are the property
of the state.    Finally, the express inclusion of the
river in the grant to the Duke of York, on March 12,
1664, the express mention of islands in the Dongan
patent, showing that they were not included by implica-
tion, the partition by the Saratoga patentees, on April
15, 1865, of " arrable lands " on both sides of the river,
the partition by them or by their successors, on June 1,
1750, of uplands on the west side of the river, and the
express partition by them or by their successors, on
May 14, 1768, of islands, rivers and falls, each without
including the bed, the grant under the Dongan charter
of a fishery franchise to Albany, the petition of General
Schuyler, on October 30, 1792, that the State grant the
bed of the river to the Northern Inland Lock Naviga-
tion Company, the provisional grant of portions
thereof to said company and the different acts author-
izing the construction of bridges over and of dams in
the river, including the acts authorizing this dam,
support the conclusion.    Title to the bed at the place
in question did not pass under the patents and is now
in the state.    That the dam is a lawful structure, even
though the state owns the bed, and that it may not be
interfered with, except by appropriation, followed by
compensation, under section 4 of the Barge Canal Law,
are the next claims.    It was authorized by the act of
1882.    That act authorized plaintiff's predecessor to
construct it " on their own lands," in such a manner as
not to affect the water privilege at Stillwater village,
as it then existed, or any water privilege then existing
and in use on the river between said village and the
lands of said predecessor.    The act was not passed by
the vote required for a conveyance of state property

by the legislature and was a mere license or privilege. While the licensee was to erect the dam on its own lands, those words related to its lands on each shore, to which it was to be anchored. And, while the license was one to erect the dam so as not to interfere with water privileges then existing at the village and on the river between the village and the property of said predecessor, it was also subject to public navigation rights, and the reserved right of the state to improve the navigation of the river and to prevent and to remove obstructions therein must be read into the act. *Smith v. City of Rochester,* 92 N. Y. 484; *Lehigh Valley R. R. Co.* v. *Canal Board,* 146 App. Div. 151, 159; affd., 204 N. Y. 473, 474. After that act was passed, the dam was constructed with crest at elevation 64.5 barge canal datum and was at that elevation when the act of 1900 was passed. The act of 1900 received the vote necessary for a conveyance of state property, but the title refers only to the subject of legalizing and maintaining the then existing dam, while the body embraces subjects in addition to legalization, namely, an authorization to plaintiff's predecessor to forever maintain the dam and to flood back up the river so far as it then owned the adjacent uplands, or had rights of flowage thereon, for the purpose of maintaining the pond formed thereby, and, also, a grant to said predecessor of any interest of the state in the lands under waters of said river, covered by said dam and the building and works of said predecessor connected therewith. This act is violative of article III, section 16, of the Constitution, which provides that: " No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title," and, in addition, is void, because it attempts to alienate the sovereign right of the state to improve navigation in the river. *Matter of Long Sault Develop-*

*ment Co.,* 212 N. Y. 1.  If not, then it must be deemed to have legalized the dam, which had been built, and to have authorized the permanent maintenance of that dam, with crest at elevation 64.5 barge canal datum. And, in that case, also, the reserved right of the state must be read into the act.  Plaintiff makes no claim under this act, except that  if it is constitutional it vested in plaintiff any possible right of the state in the bed, upon which the dam is erected, and is a recognition of the fact that the dam is a lawful structure.  Its rights under the act of 1882 remain for consideration. Chapter 147 of the Laws of 1903 constitutes the Barge Canal Law.  The route at this place, under section 3, was defined as commencing in the Hudson river at Waterford and running thence up the river canalized to near Fort Edward.  It was in the bed of the river and through the dam.  Before the plans for the work were made and in August, 1904, plaintiff raised the crest of the dam to elevation 67.5 barge canal datum. That was the elevation when the state engineer made the plans and he adopted it as a basis for the locks, lock walls and other structures.  The plans provided for a lock 96 feet wide, through the dam, in the natural bed of the river.  This left a free spillway of about 700 feet.  And they provided for another lock a short distance to the north.  A contract in accordance with the plans was made and was approved by the canal board in 1908.  Work thereunder and in accordance with the plans was commenced on June 1, 1909, and was practically finished before August 1, 1912.  The construction was designed as and was an improvement of the river for navigation.  *Lehigh Valley R. R. Co.* v. *Canal Board,* 146 App. Div. 160; *West Virginia P. & P. Co.* v. *Peck,* 82 Misc. Rep. 72, 76.  On the date last mentioned, plaintiff put the flash boards on the dam and raised its elevation to 70.0 barge

canal datum. At that elevation, the locks cannot be operated except during low flows and cannot be operated at all with a flow near or at the maximum navigable stage, namely, 30,000 cubic feet per second. Moreover, they were not designed to withstand the pressure at that elevation. The power of the state to improve navigation in a navigable river for the benefit of the public, without compensation for damages to the rights of an owner of lands bordering thereon, or within the waters thereof, is not disputed. *Slingerland* v. *International Contracting Co.,* 169 N. Y. 60, 70; *Lehigh Valley R. R. Co.* v. *Canal Board,* 146 App. Div. 151, 159; modified, 204 N. Y. 471, 474. And that the power existed at the place in question, notwithstanding that water rights may not or would not have been affected with the boards at elevation 70.0 cannot be successfully disputed. But plaintiff claims that the state could and that it did, under section 4 of the Barge Canal Law, assume liability for the damages resulting from the removal or destruction of structures, and that it was required to proceed under that section, by appropriation and compensation, before it could enter upon the dam, which had been authorized, and interfere with the flash boards, which formed part of it. And defendants claim that the Barge Canal Law itself worked the revocation of the license, without a specific appropriation and without compensation. Defendants did not proceed under the section. As it stood at the time in question, section 4 was contained in chapter 273, Laws of 1909, and read: " The state engineer may, subject to the following conditions, enter upon, take possession of and use lands, structures and waters, the appropriation of which for the use of the improved canals or for the utilization and full control by the state of the waters impounded, created and to be discharged as

the result of the construction of any dam &ast; &ast; &ast; or for purposes of the work and improvement authorized &ast; &ast; &ast; shall in his judgment be necessary." Then follow provisions prescribing the steps to be taken and giving the Court of Claims "jurisdiction to determine the amount of compensation for lands, structures and waters so appropriated." The question of the alleged trespass in removing the body of the dam for the distance of 96 feet is not here. This is the subject of another action and is incidental here. And it is unnecessary to decide here the question of the connection between the head of water created by the dam and the the dam itself and whether or not that head is comprehended within the meaning of the word "structures." But the sole question is whether or not the dam, including the flash boards as forming part of it, is a structure within the meaning of the section, requiring appropriation and compensation. Considering that the legislature had theretofore authorized the construction of a number of dams in this part of the river, it is significant that the section does not refer to them specifically and the omission so to do indicates that it was the intention of the legislature not to include them. As used, the word should be limited to structures, not built upon the bed under a revocable license, for which no consideration was paid. Something more definite than the fact that the word "structure" may include the word "dam" is required to fix liability upon the state. The intent of the state to assume liability must appear more clearly than this. The bridge cases are not analogous. *Lehigh Valley R. R. Co.* v. *Canal Board,* 146 App. Div. 151, 160–164; modified, 204 N. Y. 471, 474; *Halfmoon Bridge Co.* v. *Canal Board,* 78 Misc Rep. 284. Those decisions involved the construction of section 3 of the law, namely, "New

bridges shall be built over the canals to take the place of existing bridges wherever required, or rendered necessary by the new location of the canals.'' And it was held that the facts that the section referred to bridges specifically, that no distinction was made in the building of new bridges in place of existing ones and other work, that the state was building, at its own expense, many new highway bridges, where required and rendered necessary, that the word '' highway '' before the word '' bridges '' was stricken out before the act was passed, that section 5-a, added by chapter 180, Laws of 1909, referred specifically to compensation to be made to any '' person or corporation * * * on account of the expense of constructing bridges for their use in crossing the new routes provided for in this act,'' and that the state engineer included the cost of bridges in his estimate of the cost and expense of the entire work, indicated that it was the intent that the state should pay for bridges. There is no such evidence here. Aside from this, the flash boards raised the pool elevation, so that the water impounded and obstructed, or, if they have not been removed, would have impeded and obstructed, navigation. They were not authorized and the dam to that extent, at least, was an unlawful structure. A demand was made upon plaintiff to remove them, but plaintiff refused, so that defendants were warranted in removing them as unlawful. It is my opinion that the complaint must be dismissed.

Ordered accordingly.