## DETERMINED IN THE

# FIFTH DEPARTMENT,

AT

# GENERAL TERM,

## October, 1885.

IN THE MATTER OF THE APPLICATION OF THE COMMISSIONERS OF THE STATE RESERVATION AT NIAGARA, ON BEHALF OF THE STATE OF NEW YORK, TO TAKE CERTAIN LANDS IN THE VILLAGE OF NIAGARA FALLS.

*Taking land for public use — power of the legislature to make the report of commissioners final — 1883, chap. 336 — what is a sufficient appropriation for the payment of damages to a landowner — 1885, chap. 182 — grant by the State of land fronting on a navigable river — the title to the bed of the stream remains in the State — Niagara river is a navigable river — a riparian owner may acquire, by prescription, a right to maintain a dam on, and divert the water of a navigable river — right to an island artificially formed in the bed of a stream — extent of the right limited by actual user.*

Section 9 of chapter 336 of 1883, authorizing the selection, location and appropriation of certain lands in the village of Niagara Falls for a State reservation, provides that twenty days after the confirmation of the report of the commissioners, to be appointed therein, any party may appeal therefrom to the General Term of the Supreme Court, which may direct a new appraisal before the same or new commissioners, in its discretion. It further provides that, "the second report shall be final and conclusive on all the parties interested."

*Held*, that the denial of a right to review the second report did not violate the provisions of the State Constitution, providing that no person shall be deprived of his property without due process of law.

The fourteenth section of the said act provides that in case the legislature should fail to make an appropriation, within two years after the passage of the act, to pay the owners of the lands which might be selected and located by the commissioners, all proceedings which might have been taken for acquiring the title to the lands should be void and of no effect. The act was passed

April 30, 1883. On April 30, 1885, an act was passed appropriating $1,433,429.50 to pay the amounts which had been awarded by the commissioners to the owners of lands to be taken, by their report which had been filed on September 20, 1884, and confirmed by an order of the Supreme Court, made in October, 1884. The appellant claimed that the act of 1885 did not comply with the requirements of the act in 1883, in that it did not certainly provide for the payment of the damages which might eventually be awarded to the owners, as the amount of the appropriation was limited to the amount of the awards then made, and no provision was made for any increase thereof that might subsequently be made:

*Held*, that as the report of the commissioners, while it stood confirmed, had the character of a judgment, it was presumed to represent the sum to which the owners were entitled and that the objection could not be sustained.

*Quære*, as to whether the validity or effect of the act of 1885 could be considered upon this appeal, which was brought to review an appraisal and award filed, and an order confirming the same made within the two years and before the passage of the latter act.

In 1814 the State, by letter patent, granted to one Porter a tract of land described as lots No. 42 and 43 of the unappropriated lands lying along the easterly side of the Niagara river, as those lots had been surveyed and described in the field-book and map of the lands theretofore filed, together with all and singular the rights, hereditaments and appurtenances to the same belonging, or in anywise appertaining thereto, excepting and reserving all gold and silver mines. The field-book referred to described the boundary lines as running to, along and by the Niagara river.

*Held*, that if the Niagara river was a navigable river the patent did not divest the State of its title to any part of the bed of the stream.

That, for the reasons that the Niagara river was in fact navigable, and that it constituted the natural boundary between the United States and Canada, it was to be deemed a navigable river; and that this being so the title to the bed of the stream remained in the State and did not pass by the grant to the riparian owners.

That the fact that at the particular place in question, the vicinity of Niagara Falls, the river is not navigable, by reason of the interruption produced by the falls, does not qualify or distinguish in that locality its general character as a public river.

The parties claiming title to the lands adjoining the river under the said grant, and their successors, had built a pier or wing-dam extending out into the river, which diverted a portion of the waters thereof into a canal constructed by them, from which it was taken into mills and manufactories built on the said lands, and there used for mechanical purposes. It appeared that a pier, forty or fifty feet in length, was constructed as early as 1812, and that the same was, in 1820 and 1821, extended some distance up the river. The evidence as to how the dam as then extended compared with the present one was conflicting. Some evidence was given tending to show that it was, up to 1849, 135 feet less in length than at the present time; that in 1849 it was extended

100 feet, then it was again extended in 1850 and 1851, in 1859 and 1860, and again in 1880. In this proceeding, instituted to appraise the damages to be sustained by the riparian owners by the taking of their lands, they claimed to have acquired a prescriptive right to maintain the dam in the bed of the stream and to divert the waters thereof, and to be entitled to recover damages for being deprived of such rights. The counsel for the State contended that the dam was a public nuisance, and that for that reason its continuance and use could not ripen into a right.

*Held*, that as it appeared that the river was incapable of actual navigation at this place, and that the diversion of this water did not affect the navigability of the river elsewhere, this contention could not be sustained.

That the riparian owners were entitled to recover damages for being deprived of their right to divert and use the water of the river by means of a dam of such a size and width as the evidence showed had been by them erected and openly and notoriously maintained for a period of forty years immediately preceding the institution of these proceedings, but not for being deprived of any waters diverted by any extension of the dam made during that period of time.

In excavating the canal made by the riparian owners, the materials removed were deposited in the river and resulted in the formation of a piece of land adjacent to the bank.

*Held*, that the title to this land remained in the State.

By the provisions of a deed partitioning among the then owners thereof the lands granted by the State, made in 1840, the right to divert from the channel sufficient water to propel two runs of stone was reserved to the owner of each lot. Owing to the improvements in water-wheels, and to an increase in the effective head of the water, occasioned by a deepening of the channel, which had taken place between the time the partition was made and these proceedings were instituted, the effective power of the quantity of water reserved by that deed to each lot owner had been greatly increased and its rental value enhanced. After the report of the commissioners had been made, a judgment was entered in an action brought by the owners of these lots, which determined the aggregate quantity of water which all were entitled to draw from the canal per minute, and the proportion thereof to which each lot owner was entitled.

By chapter 111 of 1885 the appellant was authorized to present to the Supreme Court, upon appeal, as evidence in his behalf, the said judgment-roll, to be "considered by the court on said appeal as to its competency, materiality and relevancy, as if the said evidence had been received by the commissioners of appraisement under objection and exception."

*Held*, that as the State was not a party to the action, the judgment entered therein did not conclusively establish, as to it, the quantity of water which the riparian owners were, jointly or separately, entitled to draw from the river.

It was claimed by the appellant that, after having acquired the right to that portion of the bed of the river embraced within the wing-dam, which they

were entitled to maintain, they had the right to draw over that section of the bed any amount of the water of the river which they could cause to flow thereon, without regard to what amount had previously passed over it.

*Held,* that the claim was untenable; that their right of diversion was limited, as against the State, to the quantity diverted during the period of forty years.

APPEAL by Rowland F. Hill from the appraisal and report of the commissioners and from the order of the Erie Special Term confirming their report. The proceeding was taken pursuant to chapter 336, of Laws of 1883, entitled "an act to authorize the selection location and appropriation of certain lands in the village of Niagara Falls for a State reservation and to preserve the scenery of the Falls of Niagara" as amended by Laws of 1884, chapter 109. Upon the application of " the commissioners of the State reservation at Niagara" the court appointed Luther R. Marsh, Matthew Hale and Pascal P. Pratt, as commissioners of appraisement, and they proceeded to ascertain the compensation which should be made to the owners of the property so selected and located pursuant to such act.

On the 20th day of September, 1884, they made their report whereby was awarded for the entire property $1,423,429.50, of which there was awarded to the appellant Hill $81,690, as compensation for his property embraced within it; which property was owned by Hill and Murray when the proceeding was instituted, but during its pendency Hill succeeded to the interest of Murray. The report was confirmed by the order of the court in October, 1884. And by Laws of 1885, chapter 182, an amount equal to that of the awards was appropriated to pay them.

The premises in question consisted of three and a half lots containing forty-nine one-hundredths of an acre upon which is a hotel and a pulp mill with a water-power used to propel machinery which the appellant claims is largely an element of value of the property sought to be taken. The facts involved in the questions presented upon the review are stated in the following opinion.

*William G. Choate, Charles W. Dayton* and *Brundage & Chipman,* for the appellant.

*Ansley Wilcox,* for the commissioners of the State reservation, respondent.

BRADLEY, J. :

The ninth section of the act of 1883 (chap. 336)provides that within twenty days after confirmation of the report, an appeal may be taken to the Supreme Court from the appraisal and report, which may be heard at General Term : that on the hearing of such appeal the court may direct a new appraisal before the same or new commissioners, and that " the second report shall be final and conclusive on all the parties interested."

The counsel for the appellant contends that the provision denying the right of review of the second report is in violation of article 1, section 6 of the Constitution of the State, and of the fourteenth amendment of the Constitution of the United States, in that it seeks to deprive him of property without due process of law. This proposition has some support if the commissioners cannot be treated as a judicial tribunal. When organized they constitute a court, and are recognized as such by the Constitution of the State, for the purposes of ascertaining the compensation to be made (other than by the State) for property taken for public use. (Art. 1, § 7.) This provision is the same as that for condemning property for purposes of railroads (Laws of 1850, chap. 140, § 18), which has been held valid. (*In Matter, etc., of P. P. and C. I. R. R. Co.*, 85 N. Y., 489.) And there is no apparent reason for requiring the application of a different rule as against the State.

The fourteenth section of the act of 1883 contains the provision, that in case the legislature shall fail to make an appropriation within two years after the passage of the act, to pay the owners for the lands which may be selected and located by the commissioners, all proceedings which may have been taken shall be void. It is urged that this provision was not complied with and that the proceedings taken were ineffectual for any purpose. This act was passed April 30, 1883. And on April 30, 1885, an act was passed appropriating $1,433,429.50 to pay the awards. It contains no provision which permits the payments in any event of any greater amount. The contention is founded in the fact that the possible increase of the amount of the awards is in no manner provided for ; that no authority is given to pay, and no means furnished to obtain payment of the increase in the event that it should be required by the final result of the proceedings taken to condemn the property. It may be questionable

whether the act of 1885 (chap. 111) and its effect are properly here for consideration, since this is a review only of the appraisal and award and the order of confirmation, all of which was done within the two years and before that act was passed. The act of 1885 has relation to the consequences of the proceeding rather than to the judicial action of the commissioners, whose determination is the subject of inquiry on this appeal. If no right in the State to take the property is derived from the action of the commissioners and the court, by reason of defective legislation, a question is presented for consideration elsewhere and may not necessarily arise on this review.

The property cannot be taken without compensation, and until there is a certainty that it will be paid, or may be obtained, the owners cannot be divested of their property. That rule applies no less to the State than to a private corporation, except that in view of the fact that the whole property in the State is held subject to the power of taxation for its legitimate purposes, it may not be required to pay before it can acquire title to property for public uses by means of the right of eminent domain, yet before it is taken an adequate remedy must be provided which will enable those entitled to payment, to seek and obtain it through the aid of the courts, if it may become necessary to resort to them. (*Bloodgood* v. *M. and H. R. R. Co.*, 18 Wend., 9, 18; *Rexford* v. *Knight*, 11 N. Y., 308, 314.) The question raised by the appellant's counsel is that the act of 1883 has provided that its continued existence as a law to support the proceedings, and the validity of them taken under it, should depend upon subsequent legislation which has not been had to the extent required to support them, because the later act does not contain provisions which give certainty that the appropriation there provided for and permitted will cover the amount required to pay the compensation which may eventually be awarded for property; that it arbitrarily limits the amount to be paid and received to that of the sums awarded, while the possibility exists for its increase by new appraisal and award, and that therefore the act of 1885 is not a compliance with the provisions of that of 1883, requiring for the support of the proceeding an appropriation to pay the owners for the lands so selected and located.

The apparent amount required to make such payment is provided for by the act in question. The report of the commissioners, while

it stands as confirmed, undisturbed, has the character of a judgment, and is presumed to represent the sum to which the owners are entitled as compensation. The appropriation was made to provide for such payment, and it does not appear that it may not be sufficient to pay the awards in the event of a new appraisal. We think the proceeding has not fallen for want of legislation.

The other questions presented have relation to the value of the property of the appellant embraced within that so selected and located, with its appurtenances, which involved the consideration by the commissioners, to some extent, of the rights the owners of these premises had to take and appropriate water from Niagara river for hydraulic purposes, which depended somewhat upon the question whether or not the river was a navigable one, and the title to the bed of the easterly half of it in the State, and if so, whether a prescriptive right had been acquired to divert from it water to the premises for the uses to which it was there applied, and to maintain structures in the river for that purpose. The commissioners held that it was a navigable river, and that the riparian owners had no title to any portion of its bed ; and no right, as against the State, to maintain such structures in it to divert its waters, unless it was afforded by such continued use as to permit the presumption of a grant. But they allowed compensation, based upon such right, without definitely determining that it existed.

It is contended that the grant, under which the title to the property in question is held, carried its boundary to the center of the river, and that the river is not a navigable one in the common-law meaning of that term.

By the treaty and cession of 1786, between the States of New York and Massachusetts, which gave to the latter the proprietary right to that part of the State west of what is known as the preemption line (running from Pennsylvania northerly through Seneca lake), there was reserved to the State of New York, one mile in width along the easterly side and for the whole length of the Niagara river. And in June, 1814, it, by patent, granted to Augustus Porter and Benjamin Porter a tract of land (including that in question), described as lots 42 and 43, of the unappropriated lands lying along the easterly side of the Niagara river, as those

lots had been surveyed and described in the field book and map of the lands filed, etc., together with all and singular the rights, hereditaments and appurtenances to the same or in anywise appertaining, excepting and reserving all gold and silver mines. The field book referred to described the boundary lines as running to, along and by the Niagara river.

It is contended that this grant, by its terms, or by necessary implication, conveyed the bed of the river to its center, and that the reservation, of gold and silver mines only, has some significance in that direction. We think there is nothing in that patent which had the effect to divest the State of any part of the bed of the stream if it was a navigable river.

In August, 1820, Benjamin Porter released his interest in the lands to Augustus Porter, who, in December, 1824, conveyed an undivided half to Peter B. Porter. And they, in January, 1840, made between themselves a partition of them, by which they described the lands by lots and parcels and took title in severalty. And by this partition deed reference was made to the water and mill facilities furnished by some of the lots; and for the purpose of the regulated use of such privileges thereby declared to be necessary for the profitable occupation and enjoyment of them in common with other proprietors similarly situated, it was by such deed covenanted that each of the parties should thereafter have the right and privilege of taking and drawing for each lot apportioned to him, situated on what was called the lower canal, so much water as should be sufficient by a prudent use thereof to drive two run or pairs of mill stone upon such water saving principles as are usually adopted by skillful engineers and builders, subject in common with other proprietors to whom the right of using the water is or may be granted, and that each of the parties defray his just and equal proportion of the expenses of the necessary enlargement, extension, maintenance, preservation and reparation of the canal, raceways, etc.

Amongst the lots on the lower canal and included in such partition were those numbered 16, 18, 20 and half of lot 14, of which Hill and Murray became the owners in 1877. They constitute the premises in question. For the purpose of supplying this canal with water a wing dam has been constructed of the length of 365 feet

extending into and up the Niagara river from the head of the canal,. and by which the water is diverted and conducted into it.   The dam is supported by the bed of the river.   From this canal water is taken on to the lots adjacent to it and applied as power to propel machinery. The appellant has a pulp mill on his premises so operated.   And the value of the property depends largely upon the right to maintain this dam to supply the canal with water.   As between individuals probably no question could arise in respect to the right to make and maintain the dam.   But as against the State the inquiry arises whether it or the riparian owners have title to the bed of the river to its center.   By the common law, title to the beds of navigable rivers was in the sovereign.   And grants of land bounded by such rivers passed title to high-water mark only, while grants of land on one side of and bounded by rivers not navigable included one-half the stream and made its thread the boundary line.   Those in the common-law sense of the term deemed navigable, were rivers only in which and where the tide ebbed and flowed.   In many of the States that rule in its strictness has been and is applied, and in others the large fresh water rivers having adequate capacity and used for general purposes of navigation, are deemed navigable, and the States · assume to have the proprietary interest in and jurisdiction over them, and substantially the same rule is applied to them as that of the common law to those whose waters are subject to tidal influence, with the difference in some instances that the low instead of the high water mark is adopted as the boundary line of the riparian owner.

This distinction is one of property only, and does not affect the public easement, for by the common law all fresh water rivers of sufficient magnitude and capacity for navigation are public highways, and although the entire proprietary interest of them is in the riparian owners, they have such title subject to the easement of the public, which they cannot lawfully interrupt.   (*Browne* v. *Scofield*, 8 Barb., 239 ; *Treat* v. *Lord*, 42 Me., 552 ; S. C., 66 Am. Dec., 298.)   But the right to the usufruct and enjoyment of the waters for any purposes to which water or its power may be applied is appurtenant to the ownership of the adjoining land, and may be so appropriated by the riparian owner, subject only to such easement and to the limitation that the rights of other riparian owners

equally entitled to such use shall not be infringed.   The rule is otherwise in respect to navigable rivers.   There the property is in the sovereign or State, and the riparian owners as against it, for its use, have no proprietary interest or right in the waters as appurtenant to the soil owned by them on the river banks.

Whether the common-law qualification is applicable to the large rivers in this country has had some consideration by the courts of this State, and produced diverse views in the opinions of jurists. And the conclusion has been reached that the Hudson, beyond tidal influence, and the Mohawk, are navigable, and the State has title to, and jurisdiction over them, as effectually as those where tide ebbs and flows.   (*The Canal Appraisers* v. *the People ex rel. Tibbits,* 17 Wend., 571; *People* v. *Canal Appraisers,* 33 N. Y., 461.) And the discussion furnished by the opinion in the latter case did not distinguish the Mohawk from other fresh water rivers of like magnitude and capacity for purposes of navigation, but seemed to place the departure from the common-law rule upon asserted reasons applicable to that class of rivers in this country, which do not apply to those of England ; that while those of that country and the portions of them not affected by the tide are comparatively short and of small magnitude, there are fresh water rivers in this country of great length and size, and having capacity for continuous actual navigation, and which are navigated by large vessels for commercial purposes.

In *Commissioners, etc.,* v. *Kempshall* (26 Wend., 404), which related to the Genesee river, the common-law doctrine was reaffirmed ; but assuming that the contrary effect should be given to the decision of the Tibbits' case, then it was said that as the State had granted away its title to the Genesee river by the cession to Massachusetts in 1786, and the defendant there held under such grant and the State had no proprietary right, he took to the center of the river, and such right to the enjoyment of the waters as was appurtenant to his relation of riparian owner.   The last proposition is not applicable to the Niagara river, no part of which was covered by such grant as has been before observed.   And in the later case of *Smith* v. *Rochester* (92 N. Y., 463) the views expressed in the opinion delivered were to the effect that the common-law rule applied to the fresh water rivers in this State without reference

to their size, capacity or importance for the purposes of navigation, and consequently to all those where flux and reflux of the tide was absent the riparian owners, whose lands are bounded without restriction by such rivers or their banks, take title respectively from either side to the thread of stream with all the rights appurtenant; and that the Hudson above tidal influence and the Mohawk are distinguished from other fresh water rivers by reference to the fact that the early and original settlers along those rivers derived their titles from Holland where the civil law prevailed

It may be difficult on principle to see how the civil law gained and had supremacy in the valleys of the Hudson and the Mohawk, but it may be that long assumption and recognition, as between the State and the owners there, in respect to the proprietary rights to those rivers, are entitled to consideration in determining their *status*. But the opinion proceeds to say that it is generally conceded that this doctrine of the common law " is inapplicable to the vast fresh water lakes or inland seas of this country, or *the streams forming the boundary lines of States.*" And in the Tibbits' case the chancellor, while supporting the application of the common-law rule to the rivers in this State, adds that a different rule must probably prevail as to those streams which form the natural boundaries between us and a foreign nation, and supports that proposition by very good reasons founded neither in the common or civil law, but in reasons national and international.

The line between the United States and Canada is located in the center of Niagara river. (Treaty of 1783, 8 U. S. Stat. at Large, 55 ; and that of Ghent in 1814, Id., 221 ; and such is the boundary of Niagara county, Laws of 1808, chap. 60.) So far as our attention has been called to any authority relating to this river it has been recognized and treated as, in every sense, a public river, as much as if it was an arm of the sea in which the tide flowed, and acknowledged as such. (*Tibbits' Case*, 17 Wend , 623 ; *Kingman* v. *Sparrow*, 12 Barb., 201.) And we think because it is navigable in fact, and constitutes the natural boundary between this and another country, is the reason why the proprietary right from its margin to such boundary line is in the State, and that the riparian owners have taken by the grant referred to only to the water's edge of the stream. And that the fact that at the particular place in

question the river is not navigable by reason of the interruption produced by the falls, does not qualify or distinguish it in that locality as a public river from its general character. We do not deem it necessary for the purposes of this case to further express any opinion in respect to the applicability of the common-law doctrine referred to, to the large rivers in this State which constantly afford facilities for floating large vessels, except when navigation is interrupted by ice.

It follows that the riparian owners had no lawful right as against the State to construct and maintain the wing dam in question, and therefore no right to claim compensation for the value of its use for supplying water power to operate machinery on the premises, unless it was constructed, and has been maintained under circumstances including those of acquiescence on the part of the State, such as to equitably entitle the owners to relief, or unless they have the support of a prescriptive right to maintain it. In respect to the latter it will be assumed that the State could grant its right of property in this river and its bed, and that a right might to that extent be acquired through the statute of limitation, by such enjoyment for the period of forty years as is required to bar the right of action to terminate such encroachment, occupation and use. (Code Pro., § 75 ; Code Civil Pro., § 362 ; *People* v. *Van Rensselaer*, 8 Barb., 189 ; *People* v. *Arnold*, 4 N. Y., 508.)

To constitute such bar and right it is necessary that the use be enjoyed under a claim of right or adversely, and that it be notorious, continuous and uninterrupted for the requisite time. (2 Wash. Real Prop. [4th ed.], 322, 326 ; *Colvin* v. *Burnet*, 17 Wend., 564 ; *People* v. *Arnold*, 4 N. Y., 508; *Miller* v. *Garlock*, 8 Barb., 153.)

It appears that a short pier, forty or fifty feet in length, was constructed there as early as 1812, and that it was extended up the river some distance in 1820 and 1821. The evidence is in conflict in respect to the distance and length then, as compared with the present dam. There is some evidence, on the part of the appellant, that it was then extended nearly to its present termination, while there is evidence to the effect that it was 135 feet less in length than the dam is now up to 1849, when it was extended 100 feet, again in 1850 and 1851, thirty feet, in 1859, 1860, and again in

about 1880 a short distance further.    And a map of 1836 was pro-
duced which located the terminus of the dam 135 feet short of
where it is at present.    This question of fact was with the commis-
sioners and justified the conclusion that the wing dam had not for
forty years had the length it now has by at least 135 feet.    The
canal as it now is, was partially made in 1812, was extended from
time to time from 1819 to 1836, when it was taken as far down as
the premises in question.    And the first building erected on them
was a saw-mill in 1841, to operate which water was taken from this
canal.    This mill was destroyed by fire about the year 1848, and no
other structure was placed on the premises requiring water-power
until 1865, when a stove foundry building was erected there, and
about ten horse-power of water from the canal was applied to
run it.    And in 1876, 1877, that structure was converted into
the present pulp mill, which contains much machinery and requires
a much larger amount of water power supplied by the canal.    But
from 1823 there were mills on some of the lots above these premises
operated by water taken from the canal.    The use and enjoyment
requisite to support the prescriptive right claimed relates as well to
the use or diversion of the water as to the continuance of the dam.
(*Stiles* v. *Hooker*, 7 Cow., 266.)    The right to the usufruct of the
water (except for purposes of navigation) is proprietary, and that of
the State is paramount.    (*Gould* v. *H. R. R. R. Co.*, 6 N. Y., 522;
*Crill* v. *Rome*, 47 How., 398, and cases there cited.)    And although
the riparian owner may as such use water of the river and has rights
in that respect which cannot be impaired by individuals, such rights
are subordinate to that of the State, and as against the latter
he cannot appropriate them to his use.    (*People* v. *Tibbetts*, 19
N. Y., 523.)    While the right to maintain the dam upon the bed
depends upon the requisite uninterrupted continuance of it at the
place where located, the right to use the water of the river is
dependent on the like continuous diversion of it.    It does not very
clearly appear how much water had been taken into the inlet and
canal for the period of forty years before the proceeding was insti-
tuted.    The evidence in respect to that fact is found in the character
of the dam and its effect in the diversion of water from the river
into the canal.    If it be assumed that it was within that time 135
feet less in length than it now is, the water then taken by it was con-

siderably less than at present.   There is evidence tending to prove. that the reduction of its length, 120 feet, would reduce the quantity of water diverted by it thirty per cent.   The commissioners were permitted to find that there was no prescriptive right as against the State to take from the river and use the quantity of water which is taken by the dam as now extended.   There had been a dam of upwards of 200 feet in length which continuously for upwards of forty years gave some supply of water to the canal, and assuming that the right was acquired to thus maintain the dam, it necessarily follows that as a consequence the diversion of the water into the canal, which it would produce, would also result as a right.   The evidence does not very definitely permit the measure of the quantity which would be supplied to the canal by the pier or dam so curtailed.

The commission, without expressing any definite determination. of the question of prescriptive right, have, by their opinion, said that they " practically decided this question in favor of the claimants, and have allowed what, in their judgment, is the full value of the water-power which has been used for the prescriptive period." This renders it unnecessary for us to give further consideration to that question, unless they have applied an erroneous principle as the basis of estimate, on the assumption that such prescriptive right existed, which question may arise as we proceed.

The contention of the counsel for the respondents, that this dam was a public nuisance, and, therefore, its continuance and use could not ripen into a right, we think is not supported.

It is conceded that the river is incapable of actual navigation at this place, and the diversion of the water there does not affect the river for that purpose elsewhere.   A public nuisance is an injury to the *jus publicum*, which in this river is that of navigation only. The common right of the public is in no manner interrupted or liable to be impaired by this structure where it is located.   Beyond the fact of navigation, the rights in the river are proprietary only, the invasion of which is to be dealt with as such.   The common right of navigation in navigable rivers of the State is in the people, and the equality of their right to use them for that purpose cannot be abridged except by themselves, through the power they have delegated to the legislature. (*People* v. *N. Y. and S. I. F. Co.,* 68 N. Y., 71–78.)

A question is presented in respect to a piece of land reclaimed from or made in the bed of the river opposite these premises and adjacent to the bank.   On the hearing there was conflict of claim to that made land, founded in the contention of those succeeding to the rights of the parties who took under the original grant that the premises conveyed to Hill and Murray did not extend to the bank of the river, but were bounded on that side by an intervening street, known as Cascade street, running along on the bank between them and the stream, and that the center of the street was the boundary line of the appellant's land.   If that contention is supported in fact he is not entitled to it, because the right to accretions as such in the bed of the river depend upon actual contiguity. And any separation of his land from such alluvion by that of another, however narrow it may be, defeats his right.   (*People ex rel. Banks* v. *Colgate*, 67 N. Y., 512 ; *Saulet* v. *Shepherd*, 4 Wall., 502 ; *The Schools* v. *Risley*, 10 id., 91 ; *Barney* v. *Keokuk*, 94 U. S., 334 ; 3 Wash. Real Prop. [4th ed.], 55.)   But it seems unnecessary to determine the question of boundary, as the formation was not such as to govern title to it by that of the contiguous bank.   To vest such title it is necessary that the formation be gradual, or imperceptible, in the legal sense of the term. (3 Wash. Real Prop., 59 ; *Halsey* v. *McCormick*, 18 N. Y., 147 ; *Cook* v. *McClure*, 58 id., 437 ; *St. Clair* v. *Lovingston*, 23 Wall., 46.)   This was not done in that manner, nor was the formation produced naturally or artifically wholly by the action of water, but by the deposit there of material excavated in the construction of the canal.   This did not divest the State of its ownership in the portion of the bed of the river so reclaimed.   (*Wetmore* v. *The B. G. L. Co.*, 42 N. Y., 384.)

The learned counsel for the appellant contends that his property was greatly undervalued by the commissioners, and that the compensation was very inadequate.   And while this contention relates to the premises, exclusive of his alleged water rights applicable to them, the latter are the subject of the greater discrepancy between the amount claimed and allowed.   By the arrangement, as has been seen, which distributed the rights to the respective owners of the lots on the canal as between themselves, each lot was entitled to sufficient water from it to propel two runs of stone.   Hill and Mur-

ray had three and a-half lots, which entitled them to sufficient for seven runs of stone.

In 1840, when such rights were defined, the water-wheels in use were those known as the tub, breast, overshot and undershot wheels, and as then ordinarily used it required from ten to twenty-five horse-power to drive one run of mill-stones. And in the use of those water-wheels, an efficiency of only from sixteen to forty per cent of power was realized, although the overshot wheel, when well placed, might give sixty per cent effective power, but this required comparatively expensive preparation, which was not usually accomplished. Since then improvements have been made, and brought into use, water-wheels which give from seventy-five to upwards of eighty per cent efficiency, and especially is that afforded by what is known as the turbine wheel. So that with the same quantity and head the efficient power is greatly increased for the propulsion of machinery upon these premises. And since 1840 the head has, by excavation, been increased from eight and a-half feet to upwards of sixteen feet practical head, thus doubling the power which may be appropriated to such uses. Upon this method of calculation, a largely increased efficiency is found, and an estimated rental value per horse-power is made on that basis, and when capitalized produces a sum very much in excess of that awarded to the appellant, but on this subject of value there is a wide difference and conflict between the witnesses of the respective parties.

The appellant has been permitted, by an act of the legislature, passed April 7, 1885 (chap. 111), to present to the court on this appeal, as evidence, a judgment-roll in an action between the persons owning lots along the canal to determine, as between themselves, their respective rights to the use of the water taken into it for hydraulic purposes. This judgment was rendered after the report of the commissioners was made and confirmed; and by it the rights of the parties to the record, as between themselves, are apparently established, in respect to the use of such water, upon the basis of the original distribution of rights before mentioned. And it declares that when that was done in 1840, with a head of eight and a-half feet, twenty-horse power, was required to drive one run of stone with the water-wheels (then in use), of thirty per cent duty, equal to a flowage of 4,152 cubic feet of water per minute. That the aggregate quan-

tity of water which all the owners may use from the canal is 107,952 cubic feet per minute, of which the owners of the premises in question are entitled to 29,064 cubic feet per minute. It is contended that this record is conclusive evidence in this proceeding of the rights of the appellant in respect to the water; and establishes the fact that, with the increased head and improved wheels, he has, for his lots, the right to appropriate upwards of six hundred effective horse-power.

The act referred to does not give the record that effect, but directs that it shall be considered by the court on the appeal, " as to its competency, materiality and relevancy, as if said evidence had been received by the commissioners of appraisement under objection and exception." So that the legislature has not adopted this adjudication as effectual to establish against the State any rights of the parties to the action by the judgment declared. The record stands upon its own merits, and has in this proceeding such support only as it alone can furnish as evidence.

The rule is general that a judgment is not evidence against one who is neither a party to the record or a privy of the parties to it, or some of them. (1 Greenl. Ev., §§ 522, 523.) By this judgment is declared the right of the parties to take to their premises and use a certain quantity of the water of the Niagara river. If that be assumed, then the matter of distribution by the judgment which concluded the parties might be effectual to establish their rights as between them respectively, and a third party interfering with their rights. But the difficulty is, that the State orginally having the proprietary interest in the use of the water of the river, does not concede, but contests their claim of right to the use of the water, and not having been a party to that action, and having had no opportunity to be heard there, the judgment in that respect has no force as against it. And when we come to inquire about that on the assumption of a prescriptive right of those parties, the question arises, how much water did such right afford them ?

It appears that the commissioners were permitted to conclude, and it may be assumed that they did hold, that those parties had no such right to the use of the water which was diverted by the dam, as it was at the time of the hearing, and that a considerable portion of it had been added within forty years. And it appears

by the evidence that by the lengthened dam the quantity taken into the inlet was only 72,000 cubic feet per minute, and only 31,000 cubic feet per minute of that entered the canal; that 33,000 feet per minute went over the spillway into the river above the canal, and the residue escaped by leakage and waste. There is, therefore, no support for the contention that those parties have acquired, as against the State, the right to take from the river into the canal 107,000 cubic feet of water per minute. And when that part of the judgment fails as a basis of calculation, it has no support as evidence in this proceeding of the *quantum* to which they are respectively entitled. It appears that the velocity of the water in the river outside and at the head of the inlet, is seventeen to twenty feet per second, and in the inlet seven and eight one-hundredths feet per second, while in the canal it is only one and one-half feet per second.

There is evidence tending to prove that the velocity of the water in the inlet and canal may be accelerated by increase of fall and capacity. And it is claimed, and there is some opinion to the effect, that by taking 120 feet from the dam the deficiency may be made up by deepening the channel of the inlet and directing chutes into it. But the supply of the quantity of water assumed as the basis of the estimates contended for will be much more than has ever been taken by means of the dam as it is.

It is contended in support of the claim that, having acquired the right to that portion of the bed of the river embraced within the wing dam, the parties have the right to draw over that section of the bed any amount of the water of the river they can cause to flow there, and that it is immaterial how much they have hitherto drawn through it or used. And that therefore the commissioners erroneously based their right upon the quantity used. But as the paramount usufructuary right to the water is in the people of the State, the riparian owners can have no greater right by prescription in respect to quantity than that afforded to them by the condition of the means of the diversion as maintained continuously for the prescriptive period. A right so afforded is defined and described in extent by the user and enjoyment which gave it. The right here under consideration is not one of physical occupation, but of diversion and use of water as appurtenant to property in connection

with the use of a certain portion of the bed of the stream for that purpose. The right depends upon use, and is limited by it, and as against the original proprietor it cannot be extended beyond that which produced the right. The people of the State, by their legislative power, are seeking to appropriate to a public use — to the use of themselves — that which is theirs, and by the right of eminent domain, property of certain individuals.

The right to the use of the running water of the river, except so far as it has become appurtenant to the property of the claimants by an acquired prescriptive right of diversion and use, remains in the people of the State, with the right to treat it as exclusively for public purposes. The right of diversion so acquired by those parties as against the State must be limited to the quantity and extent of diversion for forty years. It cannot be enlarged by the creation of additional means for appropriation of the use of it. And it may be assumed that in that view the commissioners applied the rule of measure to the rights of the claimants in that respect. So that assuming the existence of the right of diversion to the same extent as the structures maintained for that length of time may produce, for the use of the landowners, it is quite evident that the appellant is not entitled to the quantity of water or of power from it, for his premises, which is claimed in his behalf. And we cannot say in view of all the evidence that his rights in that respect have been under-estimated by the commission. It does not in any manner appear that the commissioners applied erroneous principles to their method of estimating value, or that they failed to recognize all the existing rights of the appellant, in making the award of compensation to him. He is entitled to the full market value of his property for any and the most advantageous purposes for which it is adapted or may be used. (*Boom Co.* v. *Patterson*, 98 U. S., 403 ; *Trustees of College Point* v. *Dennett*, 5 T. & C., 217 ; *Dickenson* v. *Fitchburg*, 13 Gray, 546.) There is apparent conflict of evidence in respect to the value of the property, by some of which it is estimated below the amount of the award, and by some very much in excess of it. It was such as to present a question of fact for the commissioners to determine. And they were required by the statute to and did take a personal view of the premises. We have carefully examined the evidence on that subject and think their conclusion

was justified and is supported by it. And we cannot say that the commissioners failed to award "a just and proper compensation."

We fail to discover any substantial error in the admission or exclusion of evidence on the hearing. The appraisal and report and the order of confirmation should be affirmed.

SMITH, P. J., and BARKER, J., concurred.

So ordered.